|  |  |
|---|---|
| ELIZABETH CANDELARIA, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>-vs-<br><br>CONOPCO, INC. d/b/a UNILEVER HOME & PERSONAL CARE USA,<br><br>Defendant. | No.: 1:21-cv-06760-NCM-TAM |

**PLAINTIFFS' MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**

**SQUITIERI & FEARON, LLP**
Stephen J. Fearon, Jr.
Paul Sweeny
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 421-6492
Facsimile: (212) 421-6553
Email: stephen@sfclasslaw.com
Email: paul@sfclasslaw.com

**ATTORNEYS FOR PLAINTIFF
AND THE PROPOSED CLASS**

# TABLE OF CONTENTS

Page

INTRODUCTION .................................................................................................1

FACTUAL BACKGROUND ..................................................................................3

    I.      Until 2022, Unilever Manufactured TRESemmé Containing DMDM, MCI, and MI ...........................................................................................3

    II.    DMDM, MCI, and MI Posed Common Substantial Risks to Plaintiffs and the Class...............................................................................................4

    III.   Unilever Has Long Understood the Substantial Risks Posed by TRESemmé .................5

    IV.   Unilever Provided No Warnings to Any Class Member Despite Its Knowledge ............5

    V.    By 2022, Unilever Reformulated TRESemmé to Remove DMDM, MCI, and MI and Instead Include The Safer Sodium Benzoate-Based Preservative Formula .........................................................................................9

    VI.   Plaintiffs and Class Members Used TRESemmé Containing DMDM, MCI, and/or MI and Suffered Hair Loss After Using TRESemmé .......................................11

    VII.   Class Definition and Appointment of Class Representatives and Class Counsel ..........12

ARGUMENT.........................................................................................................13

    I.      Legal Standard for Rule 23(c)(4) Issue Certification .........................................13

    II.    Plaintiffs Satisfy Rule 23(a)'s Requirements .......................................................14

         A.  Numerosity (Rule 23(a)(a))...............................................................14

         B.  Commonality and Typicality (Rule 23(a)2) and Rule 23(a)(3).....................15

         C.  Adequacy (Rule 23(c)(4)) .................................................................16

         D.  The Class Is Ascertainable.................................................................18

    III.   The Court Should Certify Central Liability Issues In this Case Under Rule 23(c)(4) ...................................................................................................19

      A.    Plaintiffs Seek to Certify Liability Issues That Will Help Prove
Elements to the Failure to Warn and Design Defect Claims That
Are Substantially Similar Across the Country ............................................19

           i.     A Failure to Warn Claim Has Substantially Similar
Elements Across the Country ..........................................................21

           ii.    A Design Defect Claim Has Substantially Similar Elements
Across the  Country ....................................................................22

      B.    Plaintiffs Will Prove Central Liability Using Common Evidence
and Expert Analysis Focused Solely on Unilever's Misconduct...............24

IV.    A Class Action Is a Superior Method for Adjudicating Central Liability
Issues..................................................................................................25

CONCLUSION.................................................................................................25

# TABLE OF AUTHORITIES

**Cases**

*2002 Lawrence R. Buchalter Alaska Tr. v. Philadelphia Fin. Life Assur. Co.*,
  96 F. Supp. 3d 182 (S.D.N.Y. 2015) .................................................................................. 20

*Abbananto v. Cnty. of Nassau*,
  No. 19-cv-01102-GRB-JMW, 2022 WL 326982 (E.D.N.Y. Feb. 3, 2022) ............................ 14

*Anderson v. Hedstrom Corp.*,
  76 F. Supp. 2d 422 (S.D.N.Y. 1999) .................................................................................. 23

*Aspen Am. Ins. Co. v. BrassCraft Mfg. Co.*,
  No. CV 23-10679-FDS, 2024 WL 308006 (D. Mass. Jan. 26, 2024) ...................................... 23

*Cacciola v. Selco Balers, Inc.*,
  127 F. Supp. 2d 175 (E.D.N.Y. 2001) ................................................................................ 20

*Charron v. Pinnacle Group N.Y. LLC*,
  269 F.R.D. 221 (S.D.N.Y. 2010) ........................................................................................ 13

*Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*,
  502 F.3d 91 (2d Cir. 2007) ................................................................................................ 17

*Ebin v. Kangadis Food Inc.*,
  297 F.R.D. 561 (S.D.N.Y. 2014). ....................................................................................... 18

*Evans v. Nacco Materials Handling Grp., Inc.*,
  295 Va. 235, (2018) .......................................................................................................... 24

*Force v. Ford Motor Co.*,
  879 So. 2d 103 (Fla. Dist. Ct. App. 2004) ......................................................................... 23

*Fort Worth Employees' Ret. Fund v. J.P. Morgan Chase & Co.*,
  301 F.R.D. 116 (S.D.N.Y. 2014) ........................................................................................ 16

*Freeland v. AT&T Corp.*,
238 F.R.D. 130 (S.D.N.Y. 2006) ................................................................................ 15

*Gorta v. Capala Bros., Inc.,*
257 F.R.D. 353 (E.D.N.Y. 2009)….………………………………………………… ...*13*

*Hicks v. Com. Union Ins. Co.*,
652 So. 2d 211 (Ala. 1994). ..................................................................................... 22

*Humphrey v. Diamant Boart, Inc.*,
556 F. Supp. 2d 167 (E.D.N.Y. 2008). ..................................................................... 21

*Humphrey v. Diamant Boart, Inc.*,
556 F. Supp. 2d 167 (E.D.N.Y. 2008) ...................................................................... 21

*In re Agent Orange Prod. Liab.*,
818 F.2d 145 (2d Cir. 1987)...................................................................................... 15

*In re AXA Equitable Life Ins. Co. COI Litig.*,
595 F. Supp. 3d 196 (S.D.N.Y. 2022)....................................................................... 20

*In re Blech Sec. Litig.*,
187 F.R.D. 97 (S.D.N.Y. 1999) ................................................................................ 13

*In re Combat Arms Earplugs Products Liab. Litig.*,
No. 3:19MD2885, 2021 WL 2186831 (N.D. Fla. May 27, 2021) ............................. 21

*In re Dreyfus Aggressive Growth Mut. Fund Litig.*,
No. 98 CIV.4318(HB), 2000 WL 1357509 (S.D.N.Y. Sept. 20, 2000).................................... 16

*In re Fosamax Prods. Liab. Litig.,*
248 F.R.D. 389 (S.D.N.Y. 2008) .............................................................................. 14

*In re Frontier Ins. Grp., Inc. Sec. Litig.*,
172 F.R.D. 31 (E.D.N.Y. 1997) ................................................................................ 16

*In re Nassau Cty. Strip Search Cases*,
461 F.3d 219 (2d Cir. 2006)...................................................................................... 13

*In re Nigeria Charter Flights Cont. Litig.*,
  233 F.R.D. 297 (E.D.N.Y. 2006) ................................................................ 21

*In re Veeco Instruments, Inc., Sec. Litig.*,
  235 F.R.D. 220, 237 (S.D.N.Y. 2006) ......................................................... 13

*In re Vitamin C Antitrust Litig.*,
  279 F.R.D. 90 (E.D.N.Y. 2011) .................................................................. 17

*Jacob v. Duane Reade, Inc.*,
  293 F.R.D. 578 (S.D.N.Y. 2013) ................................................................ 13

*Langan v. Johnson & Johnson Consumer Companies, Inc.*,
  897 F.3d 88 (2d Cir. 2018).......................................................................... 20

*Nnebe v. Daus*,
  No. 06-CV-4991 (RJS), 2022 WL 615039 (S.D.N.Y. Mar. 1, 2022) ........................ 13

*Novella v. Westchester County*,
  661 F.3d 128 (2d Cir. 2011)........................................................................ 14

*Palmatier v. Mr. Heater Corp.*,
  163 A.D.3d 1192, 82 N.Y.S.3d 186 (3d Dep't 2018) ...................................... 22

*Reeves v. Cincinnati, Inc.*,
  439 N.W.2d 326 (1989) .............................................................................. 23

*Robidoux v. Celani*,
  987 F.2d 931 (2d Cir. 1993)........................................................................ 14

*Robles v. Shoreside Petroleum, Inc.*,
  29 P.3d 838 (Alaska 2001)). ....................................................................... 21

*Shahriar v. Smith & Wollensky Rest. Grp., Inc.*,
  659 F. 3d 234 (2d Cir. 2011)....................................................................... 15

*Shanks v. Upjohn Co.*,
  835 P.2d 1189 (Alaska 1992)...................................................................... 22

*Steinberg v. Nationwide Mut. Ins. Co.*,
  224 F.R.D. 67 (E.D.N.Y.2004) ............................................................................ 21

*Sullivan v. Aventis, Inc.*,
  No. 14-CV-2939-NSR, 2015 WL 4879112 (S.D.N.Y. Aug. 13, 2015)..................................... 22

*Sykes v. Mel S. Harris & Assocs. LLC*,
  780 F.3d 70 (2d Cir. 2015)............................................................................... 15

*Wagner v. Kobelco Stewart Bolling, Inc.*,
  No. 07-CV-583S, 2014 WL 12725717 (W.D.N.Y. Dec. 29, 2014) ............................................ 23

## INTRODUCTION

Plaintiffs Elizabeth Candelaria and Zebin Hossain[1] suffered severe hair loss (including hair falling out in clumps) after using TRESemmé hair care products manufactured by Defendant Conopco, Inc. d/b/a Unilever Home & Personal Care USA ("Unilever"). TRESemmé contained DMDM hydantoin ("DMDM"), methychloroisothiazolinone ("MCI"), and/or methylisothiazolinone ("MI"), three dangerous, sensitizing preservatives known to cause hair loss.

When Plaintiffs started losing hair after using TRESemmé, they did not know that Unilever had previously received strikingly similar reports of hair loss as demonstrated by an internal spreadsheet concerning complaints related to the use of TRESemmé containing DMDM. Ex. 12, Complaint Spreadsheet, Complaint Dated 5/15/2017 (consumer notifying Unilever that she used TRESemmé and "her hair began falling out"); Complaint Dated 7/20/2017 ("Consumer and her 11 year old daughter are experiencing hair loss."); Complaint dated 11/6/2017 (consumer notifying Unilever she used TRESemmé shampoo and was " experiencing severe hair fall").[2] Hundreds of women had a similar experience, suffering hair loss after using TRESemmé, without any warning from Unilever that it had received numerous reports of hair loss or that a person should stop using TRESemmé immediately if they suffered a skin reaction or lost hair.

Common evidence will show that TRESemmé used by Plaintiffs and the Class contained the chemicals DMDM, MCI, and/or MI and posed a substantial danger of causing hair loss. That evidence includes abundant medical and scientific literature published before Plaintiffs were injured. It also will include evidence about how, before Plaintiffs and the Class members were

---

[1] Ms. Hossain asserts substantially similar claims against Unilever United States, Inc. before this Court in *Hossain v. Unilever United States, Inc.*, No. 1:21-cv-NCM-TAM (E.D.N.Y.) and is being proposed as a class representative, along with Ms. Candelaria. Ms. Hossain filed the first of these actions and the parties have coordinated discovery and proceedings in this case with *Hossain*. Ms. Candelaria and Ms. Hossain are collectively referred to as "Plaintiffs."
[2] "Ex___" refers to exhibits attached to the accompanying Declaration of Stephen J. Fearon, Jr.

1

injured, consumer advocacy groups implored Unilever to remove the dangerous chemicals; countries banned or limited the use of these chemical preservatives; and Unilever's competitors and retailers—including Johnson & Johnson, Revlon, Colgate-Palmolive, CVS Health, and Whole Foods—reformulated their products to eliminate these chemicals and used safer available ingredients or refused to sell products containing DMDM, MCI, and MI. Unilever's own expert even admits DMDM, MCI, and MI can cause hair loss, either alone or in combination.

In the face of overwhelming evidence regarding the dangers of DMDM, MCI, and MI, Unilever did not reformulate TRESemmé even though it had access to commercially practicable, safer alternative preservatives. Instead, common evidence shows that Unilever slow-rolled a global reformulation plan—called "Project Ocean"—delaying reformulation in the United States (where it faced little or no regulatory oversight) to defer costs. While Unilever delayed and failed to warn consumers about the dangers of TRESemmé, Plaintiffs and hundreds (maybe thousands) of others used TRESemmé and lost their hair. In 2022, Unilever finally reformulated TRESemmé but that was too late for Plaintiffs and the 717 injured people in the Class.

Plaintiffs filed lawsuits to hold Unilever accountable for its misconduct. *Candelaria* is brought as a class action on behalf of 717 individuals who each lost their hair after using TRESemmé and who are identified in a spreadsheet that Plaintiffs previously provided to Unilever at the Court's suggestion. *See* Ex. 2, Class Member Spreadsheet; Feb. 1, 2024 Minute Entry and Order. Plaintiffs do not seek to certify a class that includes all people who lost their hair after using TRESemmé. Instead, they only seek to include in the Class the 717 injured people Squitieri & Fearon, LLP ("S&F") represents. Similarly, Plaintiffs could seek to certify the Class for all purposes, including for determining whether TRESemmé caused each Class member to lose their

2

hair. Instead, Plaintiffs are significantly limiting the scope of the Class by only seeking to certify the Class with respect discrete central liability issues under Rule 23(c)(4), including:

(1) Whether TRESemmé containing DMDM, MCI, and MI (alone or in combination) can cause dermatitis or hair loss.

(2) Whether (and when) Unilever knew or should have known that DMDM, MCI, and MI (alone or in combination) can cause dermatitis or hair loss.

(3) Whether Unilever had a duty to warn Plaintiffs and the Class of the dermatitis or hair loss risk.

(4) Whether Unilever breached the duty to warn by failing to include any warnings to users that it had received reports of hair loss and to stop using TRESemmé if they experienced a skin reaction, dermatitis, or hair loss;

(5) Whether TRESemmé products containing DMDM, MCI, and/or MI were defectively designed and posed a substantial risk of causing dermatitis and hair loss; and

(6) Whether a reasonable alternative design existed that did not contain DMDM, MCI, or MI, including a design based on sodium benzoate, a non-sensitizing preservative Unilever eventually used to reformulate TRESemmé.

These issues are common to the Class, are amenable to common law and class-wide proof, and do not require the Court to resolve individual issues. Moreover, Class members can share the costs of establishing these common facts, avoiding the need, for example, to individually pay the cost of gathering discovery, deposing witnesses, and retaining experts. Rule 23(c)(4) certification will streamline and materially advance the litigation, the exact purpose of class actions.

## FACTUAL BACKGROUND

### I. Until 2022, Unilever Manufactured TRESemmé Containing DMDM, MCI, and MI

Until July 2022, Unilever manufactured TRESemmé shampoos and conditioners that contained DMDM, MCI, and MI. *See*, Ex. 17, Hossain Interrogatory Response 8; Ex. 18; TRESemmé Product & Ingredient Safety FAQ at 5-6. Plaintiffs and every Class member used TRESemmé containing DMDM, MCI, and/or MI and lost their hair after using the product.

**II.      DMDM, MCI, MI Posed Common Substantial Risks to Plaintiffs and the Class**

DMDM releases formaldehyde (a carcinogen). Ex. 4, Thiffault Report at V.1-3; Ex. 3, Serota Report at ¶ 11. Plaintiffs' expert toxicologist (Christine Thiffault, PhD) and expert dermatologist (Marc Serota, MD, a board-certified dermatologist, allergist/immunologist, and pediatrician) explain in their accompanying expert reports that formaldehyde is a highly toxic chemical, an allergen and irritant, and is scientifically shown to cause dermatitis and other harmful reactions, including hair loss. *See* Thiffault Report at Thiffault Report at V.1-3; Ex. 3, Serota Report at ¶ 11. Formaldehyde is heavily regulated or banned for use in personal care products. *Id.* ¶ 15. As a result, Unilever has not included formaldehyde in its personal care products for decades but instead uses DMDM to indirectly release formaldehyde into the product. *See* Ex. 9, Lalljie Depo. at 97:16-104:24; Ex. 6, Barone Depo. at 106:14-17; 115:16-116:16; 190:3-194:24.

DMDM poses the same serious risks as direct formaldehyde, including the substantial risk of dermatitis and hair loss. Ex. 4, Thiffault Report at V.4-12; Serota Report at ¶ 14 (citing abundant medical and scientific literature demonstrating the harmful effects of formaldehyde donors like DMDM). DMDM can cause dermatitis because it is quickly absorbed though the skin and causes an immune response that can worsen after repeated exposures. Ex. 4, Thiffault Report at IV.3; V.11; Ex. 3, Serota Report at 33-37; Ex 6, Barone Depo. at 169:13-170:35 (admitting repeat exposure risk). In the United States, the frequency of sensitization to DMDM has been reported in about 1.3% to 2.5% of patients suspected of allergic dermatitis. *See* Ex. 4, Thiffault Report at II.2.

As recognized by Dr. Serota, Dr. Thiffault, and even Unilever's own medical expert in the *Hossain* case, Joel DeKoven MD, the substantial risk posed by DMDM was compounded here because Unilever formulated TRESemmé with DMDM alongside MCI and MI, highly sensitizing preservatives that also cause dermatitis and hair loss. Ex. 4, Thiffault Report at VI.1-10; ¶ Serota

Report ¶¶ 25-32 (listing extensive medical and scientific literature discussing the dangers of MCI/MI). Unilever's Director of Safety, ███████, admitted that Unilever removed MI from its leave-on products and eventually all personal care products in consultation with dermatologists and clinicians because it caused dermatitis. Ex. 09, ███████Depo. at 200:16-218:8 (citing Ex. 20, Global Hair Preservatives Update and Strategy).[3] As a result, Plaintiffs and Class members experienced a one-two punch by using TRESemmé products containing DMDM and/or MCI/MI, all without any warnings from Unilever.

Dr. Serota and Dr. Thiffault both have opined that these chemicals can cause scalp irritation, including dermatitis, and have a well-established causal link to hair loss. Ex. 4, Thiffault Report at II.1 ("[S]hampoos, conditioners and hair-styling agents are known to cause scalp [allergic contact dermatitis] and hair loss") (citations omitted); III.6 ("[I]nflammation, as a result of [allergic contact dermatitis] or irritant contact dermatitis may cause alopecia or accelerated female pattern hair loss"). "The common theme is inflammation of the skin, activation of immune pathways and tissue damage leading to follicular damage and hair shedding/loss." Ex. 3, Serota Report at ¶ 39. After using TRESemmé, Plaintiffs and each Class member experienced hair loss as discussed by Dr. Serota, Dr. Thiffault, and even acknowledged by Dr. DeKoven.[4]

## III. Unilever Has Long Understood the Substantial Risks Posed by TRESemmé

Before Plaintiffs and the Class were injured here (in 2018-2021), Unilever well-understood the substantial risks that TRESemmé containing DMDM, MCI, and/or MI posed to consumers, including hair loss. Plaintiffs will show that Unilever knew or should have known about extensive

---

[3] "Q: Did you agree with the decision to remove [MI]? A: Yes. Q: Why? A: Because consumers were experiencing – some consumers were experienced a reaction. And secondly, there was also an impending regulatory view."

[4] *See* Ex. 11, DeKoven Depo. at 34:30-35:25; 63:3-64:9; 68:-69:2; 94:15-21; 98:23-2; 108;13-109:17; 146:6-23, 181:12-21 187:14-22; 195:12-18; 226:4-19; 237:13-24; 238:11-15 (repeatedly admitting that DMDM, MCI, and MI are common sensitizers and that other manufacturers removed the preservatives before Plaintiffs were injured).

pre-injury literature Dr. Serota and Dr. Thiffault cite establishing the dangers of DMDM, MCI, and MI and their causal link to hair loss. *See, e.g.*, Ex. 3, Serota Report at ¶¶ 14, 27, 28.

Unilever also had numerous reports of its customers losing their hair after using TRESemmé containing DMDM, MCI, and MI. Between 2016 and 2021, for example, Unilever received more than 237 reports of hair loss and dermatitis reactions associated with TRESemmé containing DMDM. ¶ Ex. 12, Complaint Spreadsheet; Ex. 13, BazaarVoice Spreadsheet.[5] Unilever also knew of reviews on online retailers, including Amazon, reporting that TRESemmé caused hair loss (Exs. 14 and 15, Amazon reviews), as well as reports from consumers to the FDA reporting hair loss and dermatitis-like reactions after using TRESemmé. Ex. 5, FDA reports; *see also* Ex. 4, Thiffault Report at Ex. A. Unilever knew about these reports well-before or contemporaneous with the injuries suffered by Plaintiffs and the Class, putting Unilever on notice of the hair loss dangers associated with TRESemmé containing DMDM, MCI, and/or MI.

Instead of heeding those injury reports, or factoring them into a safety analysis, Unilever employees generally ignored the reports, pointed the fingers at other employees to investigate reports or determine their validity, and attempted to convince users that their hair loss was due to other causes. *See* Ex.6, Barone Depo. at 83:2-99:6; 128:23-138:20; 141:6-12; 305: 10-17; Ex. 9, Lalljie Depo. at 144:25-176:14; Ex. 8, Geiss Depo. at 59: 4-77:21; Stein 145:14-176:2. An example of Unilever's cavalier disregard for consumers is found in testimony given by Unilever's ███████, who oversaw consumer injury reports. When asked about a woman who reported that she lost her hair from TRESemmé, ████████ focused on the consumer apparently being "vain and pathetic" because the woman described her hair as her "pride and joy" when reporting her hair loss

---

[5] Unilever retained a company called ████████ to monitor social media about reports of injuries associated with TRESemmé. As part of its work, Bazaarvoice would isolate and prevent publication of postings mentioning hair loss associated with Tresemme.

to Unilever. Ex. 8, Geiss Depo. at 233:8-239:12. Ms. Geiss, as the head of the department dealing with consumer injury reports, set the tone at the top for the rest of the department and exemplifies Unilever's repeated refusal to tell the truth to customers.

Before Plaintiffs and the Class used TRESemmé and lost their hair, Unilever also had been sued in, and settled, class actions against it in the early 2010s involving another DMDM-containing hair care product, the Suave Keratin kit. Among other things, the plaintiffs there alleged that the defendants (including Unilever) failed to warn about the hair loss risk even though since 2011 consumers were complaining that the Suave containing DMDM caused significant hair loss, among other adverse effects. Ex. 21, *Reid* Complaint, ¶¶ 23. Hundreds of people ultimately asserted claims that they had lost hair and had other injuries after using the Suave Keratin kit. *See* Ex. 23, *Reid* Declaration in Support of Motion for Attorneys' Fees.[6]

The dangers of TRESemmé were also apparent to Unilever before Plaintiffs and the Class were injured because consumer advocacy groups repeatedly warned Unilever (including its CEO) about the dangers, and Unilever's competitors had removed these dangerous chemicals from their shampoos and conditioners long before Unilever ultimately did. For instance, in 2009, the Campaign for Safe Cosmetics Coalition sent out a letter to personal care products manufacturers, including Unilever, warning about the dangers of these toxic chemicals (including formaldehyde-releasers like DMDM) and requesting a pledge to remove them from infant personal care products. Ex. 24, Article Re Campaign for Safe Cosmetics; *see also* Ex. 25, PIRG Letter (calling on Unilever to remove formaldehyde-releasing preservatives).

In response, Unilever's competitor, Johnson & Johnson publicized its pledge to remove formaldehyde-releasers from its personal care products by the end of 2015. Lalljie Depo. at 135:7-

---

[6] Unilever has access to these records but has refused to produce them to Plaintiffs.

142:17 (citing Ex. 26, Article Re Johnson & Johnson Press Release).[7] Revlon and Colgate-Palmolive similarly removed these harmful ingredients, publicly announcing their reformulations. *Id.* at 241:5-243:3 (citing Ex. 27, Article Re: Revlon; Ex. 28, Article Re: Colgate-Palmolive); *see also* Ex. 6, Barone Depo. at 184:24-186:10; 209:5-8; 246:21-252:22.

Certain retailers, such as Whole Foods and CVS, phased out DMDM-containing and other formaldehyde-releaser preserved products in 2012 and 2019, respectively. Ex. 29, Whole Foods, Our Standard: Beyond Clean Beauty.[8] At the same time, regulators across the globe were taking steps to ban these chemicals and Unilever was facing increasingly bad public relations about continuing to use these ingredients. Unilever's knowledge about these facts, and the dangers of DMDM, MCI, and MI will be common to the claims by Plaintiffs and every Class member.

## IV. Unilever Provided No Warnings to Any Class Member Despite Its Knowledge

Unilever <u>never</u> provided any warnings regarding the hair loss risk despite knowing that risk. Ex. 6, Barone Depo. at 137: 3-19; Ex. 10, Stein Depo. at 93:2; 121: 18-126:20. Plaintiffs' warnings expert, Michael Motley, PhD (who has over 40 years of experience in the communications field), opines that Unilever should have and could have warned consumers of the hair loss risk based on Unilever's knowledge of that risk. Ex. 5, Motley Report at ¶ 36. Unilever's own employees have admitted that the Unilever Code of Conduct required them to warn of the hair loss risk after Unilever received numerous reports of injuries; consumer safety should have been Unilever's priority; Unilever should speak truthfully to its customers; and nothing prevented them from adding warnings (a conclusion supported by Dr. Motley). Ex. 6, Barone Depo. at 42:14-

---

[7] *See also* Katie Thomas, The 'No More Tears Shampoo, Now With No Formaldehyde, The New York Times (Jan. 17, 2014), https://www.nytimes.com/2014/01/18/business/johnson-johnson-takes-first-step-in-removal-of-questionable-chemicals-from-products.html.
[8] CVS Health, Removing Chemicals of Concern, May 18, 2017, https://www.cvshealth.com/news/sustainability/removing-chemicals-of-consumer-concern.html.

43:17; 60:7-78:9; Ex. 8, Geiss Depo. at 39:5-41:25; Ex. 9, Lalljie Depo. at 83:4-90:14; Ex. 10, Stein 56:1-83:20; Ex. 5, Motley Report at ¶ 29.

According to Dr. Motley, had Unilever properly warned users of the risk associated with TRESemmé, consumers like Plaintiffs and Class members could have made an informed decision about whether to buy and use TRESemmé products and would have been advised of the risks of injury. Moreover, once Plaintiff and the Class started to experience injuries (such as hair loss), a warning would have allowed them (or their physicians) to make a connection between their injuries and TRESemmé, instead of other unlikely causes. Ex. 5, Motley Report at ¶¶ 14-23.

Dr. Motley concludes that Unilever had a responsibility to disclose the hair loss risk by including a warning stating: "*CAUTION: This product contains ingredients that can cause irritated scalp and/or hair loss in certain individuals. If you experience either of these conditions, stop using this product immediately, and consult a physician if the condition persists.*" Ex. 5, Motley Report at ¶ 39. Instead of doing that, Unilever indisputably failed to provide Plaintiffs and the Class with any warnings, leaving them in the dark regarding the connection between TRESemmé and their hair loss, a key fact that is central to every Class member's claims.

**V. By 2022, Unilever Reformulated TRESemmé to Remove DMDM, MCI, and MI and Instead Include The Safer Sodium Benzoate-Based Preservative Formula**

Internal documents reveal that in 2017 or 2018, based on bans of MCI and MI in Europe, and in anticipation of a European classification of DMDM as a human carcinogen, Unilever— through its Preservative Steering Team—implemented "Project Ocean," "a project to exit contentious preservation chemicals, notably formaldehyde honors (DMDM[]) and isothiazolinones ([MCI/MI]" and to instead use primarily sodium benzoate, a preservative

9

Unilever acknowledged was "milder" and "low to medium risk." Ex. 31, Update on Project Ocean at HOSSAIN_UL_00001149; *See* Ex. 30, Email Re Ocean; Ex. 7, Carew Depo. at 52:9-100:22.[9]

Within Unilever, executives were discussing how Unilever was "uniquely exposed by continued use of [DMDM] at high volumes" versus competitors who had already reformulated. Ex. 31, Update on Project Ocean at HOSSAIN_UL_00001150; *see also* Ex. 32, Final Minutes of Preservative Steering Team, Apr. 5, 2017, Ex. 9, Lalljie Depo. at 267:13-287:19.[10] Unilever stated that: (1) "[c]overage continues to focus on possible safety concerns with [MIT], specifically its sensitizing potential;" (2) "MIT is restricted by CVS (US), Que Choiair, 60 million consumers (France) and most recently the Rossman restricted list in Poland;" and (3) [t]here is widespread consumer and media awareness of formaldehyde donors such as [DMDM] . . . [with t]he key consumer concern with formaldehyde donors is perceived risk of cancer; and (4) "[i]n beauty shampoos most competitors are now using [sodium benzoate]. Ex. 31, Update on Project Ocean at HOSSAIN_UL_00001150-51.

Instead of protecting consumers by eliminating these chemicals, Unilever slow-rolled the reformulation, starting it outside the United States because of more intense regulatory pressure and bad publicity while continuing to sell TRESemmé containing DMDM, MCI, and/or MI without a warning in the United States to Plaintiffs and the Class. In early 2017, Unilever "exited" DMDM in leave-on sprays and for "raw materials in innovation and renovation." Ex. 9, Lalljie Depo. at

---

[9] "Q: And Unilever, before it made the switch, made itself comfortable that sodium benzoate was a safe ingredient; correct? 6 A Yes. Q And sodium benzoate was available in 2011 as an alternative to Unilever and other manufacturers as an alternative to formaldehyde releasors; right? MR. LAMBERT: Objection. You can answer. THE WITNESS: I believe so."

[10] "Q: In the fourth paragraph, it says, 'In terms of alternatives for [MCI/MI] and [DMDM], the most effective and least contentious are sodium benzoate," and then it gives the chemical abbreviation as NaB, 'phenoxethanol,' and the abbreviation POE 'and benzyl alcohol for oral care.' Do you see that? A: Yeah. Q: Were these three alternatives for [DMDM]. A: They were alternatives to both systems. Remember, we are talking about two systems, the DMDM around the PR concerns, the isothiazolinones around, you know, small population, subsection of the population may have some experience some reactions."

254: 3-257: 17 (citing Ex.19, Banned or Contentious Preservatives). The original Project Ocean timeline involved removing DMDM, MCI, and MI ███████████████████

████████████████████████████████████████

████████████ *See* Ex. 33 (████████Timings Email). However, Unilever delayed the reformulation in the United States multiple times, including to delay incurring reformulation costs. Ex. 7, Carew Depo. at 103:7-110:17. It was only in 2022, and after Plaintiffs and the Class had lost their hair, that Unilever reformulated TRESemmé in the United States to remove DMDM, MCI, and MI. Ex. 17, Hossain Interrogatory Response 8; Ex. 34, Keratin Smooth Label Pictures (showing no DMDM, MCI, or MI). Despite acknowledging the dangers of DMDM, MCI, and MI, and seeking to reformulate its products based on those dangers, Unilever did not warn consumers of any dangers while it was undertaking the reformulation process between 2017 or 2018 to 2022.

Plaintiffs' toxicology expert, Dr. Thiffault, opines that sodium benzoate was a readily available, much safer alternative to DMDM that posed a much lower risk of sensitization. Ex. 4, Thiffault Report at IX.7. She explains that the safer alternative ingredients, including sodium benzoate, cause no adverse health effects to a "reasonable" certainty. *Id*. at XIII.1-4. Some of Unilever's witnesses, including Peter Carew, admitted this in their testimony. Ex. 7, Carew Depo. at 150:20-152:14. When Unilever reformulated, it did so primarily using sodium benzoate.

## VI. Plaintiffs and Class Members Used TRESemmé Containing DMDM, MCI or MI and Suffered Hair Loss After Using TRESemmé

Plaintiffs and each Class member purchased and used TRESemmé shampoos and conditioners containing DMDM, MCI, and/or MI. Ex. 35, Hossain Label Photos; Ex. 36, Candelaria Walmart.com Purchase Records; Ex. 2, Class Member Spreadsheet. Ms. Hossain began suffering substantial hair loss in mid-2018 when using, and after using, TRESemmé containing

DMDM, MCI and MI. *See id.* at ¶¶ 5-8. In May 2021, Ms. Hossain brought an individual action asserting design defect, manufacturing defect, failure to warn, and negligence claims.

Ms. Candelaria began using TRESemmé products in 2016 or 2017, including TRESemmé hair care products containing DMDM, MCI, and MI. *See* Candelaria Decl., ¶ 4. Although Ms. Candelaria had some history of hair loss, Ms. Candelaria began suffering substantial hair loss (including hair falling out in clumps) in 2019 or 2020 when using, and after using, TRESemmé containing DMDM, MCI, and MI. *See id.* at ¶¶ 5-6. On December 6, 2021, Ms. Candelaria brought this class action asserting the same claims as Ms. Hossain but on a class-wide basis.

In addition to Plaintiffs, the Class includes 715 individuals from 49 states represented by S&F. Each class member used TRESemmé containing DMDM, MCI, and MI and suffered hair loss afterwards. Ex. 2, Class Member Spreadsheet (Column F-J).

## VII. Class Definition and Appointment of Class Representatives and Class Counsel

Plaintiffs seek to certify only certain liability issues for the following Class:

> Individuals who suffered hair loss after using TRESemmé hair care products containing DMDM, MCI and/or MI during the applicable statute of limitations and who have retained S&F as their counsel.[11]

Plaintiffs seek to appoint Ms. Hossain and Ms. Candelaria as Class Representatives, and to appoint S&F as Class Counsel. Although Ms. Hossain is not a Plaintiff in this case, the parties have coordinated discovery in the two cases and the Court in its discretion may appoint her as a class representative given the near-identical substantive nature of Plaintiffs' claims, the total overlap of discovery, and the common procedural track. *See Kurtz v. Kimberly-Clark Corp.*, 321

---

[11] The Class does not include any judge or magistrate assigned to this case or Unilevers officers, directors, legal representatives, successors, and assigns. Further, to facilitate Ms. Hossain's appointment as a Class representative, Plaintiffs are seeking to certify a Class that does not exclude individuals with pending cases against Unilever. *But see* Complaint, ¶ 57 (Doc. No. 1) (originally seeking a class excluding individuals with pending cases). Individuals in other cases may opt-out of the Rule 23(c)(4) issue class after receiving Rule 23(c)(2) notice of certification (if granted).

F.R.D. 482, 554 (E.D.N.Y. 2017) ("[T]he court can modify this order to modify the class, replace Kurtz as a class representative, and replace counsel.") (citation omitted).

**ARGUMENT**

**I.      Legal Standard for Rule 23(c)(4) Issue Certification**

Rule 23(c)(4) provides that "an action may be brought or maintained as a class action with respect to particular issues." Fed. R. Civ. P. 23(c)(4). "[T]he Second Circuit has held that a class can be certified as to particular common issues under Rule 23(c)(4) in order 'to single out issues for class treatment when the action as a whole does not satisfy Rule 23(b)(3)['s predominance requirement].'" *In re Nassau Cty. Strip Search Cases*, 461 F.3d 219, 227 (2d Cir. 2006); *see also Nnebe v. Daus*, No. 06-CV-4991 (RJS), 2022 WL 615039, at *9 (S.D.N.Y. Mar. 1, 2022) ("[M]anageability concerns are adequately addressed by certifying the class as to liability only[.]"). "For particular issues to be certified pursuant to Rule 23(c)(4), the requirements of Rules 23(a) and (b) must be satisfied only with respect to those issues." *Charron v. Pinnacle Group N.Y. LLC*, 269 F.R.D. 221, 239 (S.D.N.Y. 2010) (citing 5 Moore's Fed. Prac. § 23.86(2)).

The Second Circuit directs courts to apply Rule 23 liberally and consistently endorses a broad reading of Rule 23(c)(4). *United States v. City of New York*, 276 F.R.D. 22, 33 (E.D.N.Y. 2011); *In re Veeco Instruments, Inc., Sec. Litig.*, 235 F.R.D. 220, 237 (S.D.N.Y. 2006) (quoting *In re Blech Sec. Litig.*, 187 F.R.D. 97, 102 (S.D.N.Y. 1999)). In fact, "it seems beyond peradventure that the Second Circuit's general preference is for granting rather than denying class certification." *Gortat v. Capala Bros., Inc.*, 257 F.R.D. 353, 361 (E.D.N.Y. 2009) (internal quotations omitted).

Here, Plaintiffs have established Rule 23(a)'s requirements and have shown that class-wide determination of central liability issues would "materially advance" the litigation, meriting Rule 23(c)(4) issue certification. *See Jacob v. Duane Reade, Inc.*, 293 F.R.D. 578, 589 (S.D.N.Y. 2013).

## II. Plaintiffs Satisfy Rule 23(a)'s Requirements

### A. Numerosity (Rule 23(a)(1))

Rule 23(a)(1) requires "that the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Numerosity is presumptively satisfied when a class includes forty or more members. *See In re Fosamax Prods. Liab. Litig.,* 248 F.R.D. 389, 396 (S.D.N.Y. 2008). Here, the Class consists of 717 individuals, a number far exceeding the Second Circuit's presumptive threshold for finding numerosity. *See* Ex. 2, Class Member Spreadsheet.

Unilever will likely contend that the Class should not be certified because Class members are identifiable, supposedly making joinder practicable.[12] But the "'numerosity' requirement 'does not mandate that joinder of all parties be impossible—only that the difficulty or inconvenience of joining all members of the class make use of the class action appropriate.'" *Novella v. Westchester County*, 661 F.3d 128, 143 (2d Cir. 2011). When numerosity is at issue, Second Circuit courts consider multiple factors, including judicial economy from the avoidance of multiplicity of actions and geographic dispersion. *Robidoux v. Celani*, 987 F.2d 931, 936 (2d Cir. 1993) ("Consolidating in a class action what could be over 100 individual suits serves judicial economy. Moreover, the potential class members are distributed over the entire area of Vermont.").

Here, the Court should apply the numerosity presumption given the size of the Class. *See Abbananto v. Cnty. of Nassau*, No. 19-cv-01102-GRB-JMW, 2022 WL 326982, at *4 (E.D.N.Y. Feb. 3, 2022) ("[T]his case falls well beyond the 'gray-area' of between twenty-one and forty proposed members, consequentially lessening the importance of the *Robidoux* factors."). But even

---

[12] Unilever will likely rely on *McDermott v. Fed. Sav. Bank*, No. 14-CV-6657-WFK-SJB, 2020 WL 6295058 (E.D.N.Y. Aug. 12, 2020), a case involving plaintiffs bringing collective and class labor law claims. Of the forty-nine potential class members, twenty-five had already joined the collective action. Moreover, given that the names and identities of the other class members (who all resided in the tristate area) were known, the Court found joinder would be practicable. *Id.* at *4-5. *McDermott* greatly differs from this class case—which in the first instance does not include a collective action component—based on geographical dispersion (three states in *McDermott* versus forty-nine states here) and the far greater amount of Class members in this case (forty-nine in *McDermott* to over 700 here.)

if it does not, the *Robidoux* factors easily favor a finding of numerosity. The Class is geographically diffuse, containing members from 49 states. *See* Ex. 2, Class Member Spreadsheet. More importantly, given the size of the Class, as well as the common issues underlying the Class's claims, a numerosity finding would greatly serve judicial economy, the most important factor. *Id.* at \*5 ("[T]he first *Robidoux* factor . . . outweighs all other factors."). Here, joining more than 700 identifiable individuals would be extremely difficult if not impossible, meriting certification.

### B. Commonality and Typicality (Rule 23(a)(2) and Rule 23(a)(3))

Under Rule 23(a)(2), there must be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2); A question is common if "a determination[] of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) "Even a single common legal or factual question will suffice" to prove commonality. *Freeland v. AT&T Corp.*, 238 F.R.D. 130, 140 (S.D.N.Y. 2006) (citing *In re Agent Orange Prod. Liab.*, 818 F.2d 145, 166-67 (2d Cir. 1987)). The typicality prong of Rule 23(a)(3) similarly requires that "the claims or defenses of the representative parties [be] typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). The typicality requirement "is satisfied when each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability." *Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F. 3d 234, 252 (2d Cir. 2011); *see also Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 80 (2d Cir. 2015) ("The commonality and typicality requirements of Rule 23(a) tend to merge.") (citation omitted).

Here, Plaintiffs and the proposed Class share common questions of law and fact, including whether Unilever had a duty to warn of TRESemmé's hair loss risk and whether TRESemmé containing DMDM, MCI, and MI was unreasonably dangerous, core inquiries that will need to be

answered to prove each Class member's claims. Moreover, Plaintiffs, like each Class member, suffered hair loss after using TRESemmé containing DMDM, MCI, and/or MI. *See* Hossain Decl., ¶ 7; Candelaria Decl., ¶ 5. Plaintiffs therefore satisfy Rule 23(a)(2) and Rule 23(a)(3).

Unilever will likely argue that Plaintiffs are atypical because, in Unilever's view, there are alternate explanations for Plaintiffs' hair loss, and Plaintiffs' claims are time-barred.[13] But those inquiries are premature given the limited scope of the issues Plaintiffs are moving to certify, which center on general liability issues and do not involve individual issues of causation or damages. *Fort Worth Employees' Ret. Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 133 (S.D.N.Y. 2014) ("The inquiry . . . concerns only whether Plaintiffs' claims are typical of the class, not whether any Defendants' statute of limitations defense will be successful."). Moreover, "[t]he rule barring certification of plaintiffs subject to unique defenses is not 'rigidly applied in this Circuit;' in fact, 'a representative may satisfy the typicality requirement even though that party may later be barred from recovery by a defense particular to him [or her] that would not impact other class members.'" *In re Frontier Ins. Grp., Inc. Sec. Litig.*, 172 F.R.D. 31, 41 (E.D.N.Y. 1997); *In re Dreyfus Aggressive Growth Mut. Fund Litig.*, No. 98CIV.4318(HB), 2000 WL 1357509, at *6 (S.D.N.Y. Sept. 20, 2000) (statute of limitations defense did not make plaintiffs atypical).[14]

### C.   Adequacy (Rule 23(c)(4))

Rule 23(a)(4) provides that a class action is appropriate if "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).

---

[13] Certification aside, Plaintiffs' claims are timely. "[T]he three year period within which an action to recover damages for personal injury . . . caused by the latent effects of exposure to any substance . . . in any form . . . shall be computed from the date of discovery of the injury by the plaintiff or from the date when through the exercise of reasonable diligence such injury should have been discovered[.]"CPLR § 214-c.2. Here, as will be detailed in opposition to Unilever's anticipated motion for summary judgment, Plaintiffs' claims are timely based on a straight-forward application of CPLR 214-c.2. Plaintiffs' claims also benefit from tolling based on COVID-19 executive orders.

[14] To the extent Plaintiffs and the Class are subject to common defenses (such as Unilever's statute of limitations defense), that actually favors certification. *Bishop v. New York City Dep't of Hous. Preservation and Dev.,* 141 F.R.D. 229, 238 (S.D.N.Y.1992) (typicality of defenses satisfies Rule 23).

"Determination of adequacy typically entails inquiry as to whether: (1) plaintiffs' interests are antagonistic to the interest of other members of the class and (2) plaintiffs' attorneys are qualified, experienced and able to conduct the litigation." *Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.,* 502 F.3d 91, 99 (2d Cir. 2007). "Conflicts which are merely speculative . . . should be disregarded at the class certification stage." *In re Vitamin C Antitrust Litig.,* 279 F.R.D. 90, 102 (E.D.N.Y. 2011) (internal citations and quotation marks omitted).

Plaintiffs satisfy Fed. R. Civ. P. 23(a)(4)'s adequacy requirement. Plaintiffs are prosecuting claims arising from misconduct that Unilever directed to Plaintiffs and the Class alike, and Plaintiffs' interests fully align with the interests of the Class to prosecute the claims to completion. Plaintiffs have also worked diligently to assist investigating and pursuing the claims, provide written discovery, and to appear for depositions. Candelaria Decl., ¶¶ 9-16; Hossain Decl., ¶¶ 9-16. Plaintiffs have been in frequent contact with counsel regarding the case, and they adequately understand the nature of the claims and a class representative's responsibilities. *Id.*

Regarding Rule 23(a)(4)'s second requirement, Plaintiffs have retained qualified attorneys who have no interests antagonistic to the Class. Fearon Decl. at ¶¶ 3-5. S&F has vigorously prosecuted this action on behalf of Plaintiffs and the Class, including working diligently to confer with Plaintiffs and Class members, investigating the claims, researching applicable law, drafting pleadings, opposing motions, gathering and reviewing extensive evidence, retaining experts, and deposing and defending fifteen fact and expert witness depositions. *Id.* (citing Ex. 1, S&F Firm Resume). S&F has and will continue to adequately represent the Class.[15]

---

[15]The Court should also appoint S&F as Class Counsel under Rule 23(g). The Court "must consider (i) the work counsel has done[;] (ii) counsel's experience[;] (iii) counsel's knowledge[;] and (iv) the resources that counsel will commit to representing the class." Here, S&F has diligently prosecuted this case, investigating the claims, engaging in motion practice, conducting depositions, reviewing voluminous discovery, and retaining experts. Fearon Decl. ¶¶ 3-5. S&F has significant experience in class actions and complex litigation, as well as extensive knowledge of the applicable law. Plaintiffs' counsel will continue to expend the resources necessary to successfully prosecute this case.

Unilever will likely argue that Ms. Candelaria is inadequate because Unilever believes she lacks sufficient knowledge of the claims. However, Second Circuit courts generally disfavor "attacks on the adequacy of a class representative based on the representative's ignorance." *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 41-42 (2d Cir. 2009) (internal quotation marks omitted). Here, Ms. Candelaria has the modicum of knowledge needed to be an adequate class representative, including understanding that TRESemmé is associated with hair loss as well as the fundamental aspects of class actions. *See* Candelaria Decl., ¶¶ 6-8, 14; Ms. Candelaria understands the claims, and she can adequately represent the Class.

### D. The Class Is Ascertainable

In the Second Circuit there is an implied requirement of ascertainability, requiring that a class be sufficiently definite for the court to determine whether a particular individual is a member. *In re Petrobras Sec.*, 862 F.3d 250, 260 (2d Cir. 2017) (citation omitted). This "modest" threshold "asks district courts to consider whether a proposed class is defined using objective criteria that establish a membership with definite boundaries." *Id.* at 269. Certification will only be precluded "if a proposed class definition is indeterminate in some fundamental way." *Id.*; *see also Ebin v. Kangadis Food Inc.*, 297 F.R.D. 561, 565 (S.D.N.Y. 2014).

Here, Plaintiffs have defined the Class to include individuals who are represented by S&F and suffered hair loss after using TRESemmé products containing DMDM, MCI, and/or MI. As a result, Class membership depends on reference to objective and definite elements. In fact, at the Court's suggestion, Plaintiffs previously provided a spreadsheet to Unilever identifying each Class member. As a result, the Class satisfies the *Petrobras* threshold and is ascertainable.

---

*Id.* S&F's experience and work in this case meet the requirements of Rule 23(g) and merit appointment as Class Counsel.

**III.    The Court Should Certify Central Liability Issues In this Case Under Rule 23(c)(4)**

In this case, the Court should certify the following central liability issues under Rule 23(c)(4), leaving causation and damages for later determination:

(1) Whether TRESemmé containing DMDM, MCI, and MI (alone or in combination) can cause dermatitis or hair loss.

(2) Whether (and when) Unilever knew or should have known that DMDM, MCI, and MI (alone or in combination) can cause dermatitis or hair loss.

(3) Whether Unilever had a duty to warn Plaintiffs and the Class of the dermatitis or hair loss risk.

(4) Whether Unilever breached the duty to warn by failing to include any warnings to users that it had received reports of hair loss and to stop using TRESemmé if they experienced a skin reaction, dermatitis, or hair loss;

(5) Whether TRESemmé products containing DMDM, MCI, and/or MI were defectively designed and posed a substantial risk of causing dermatitis and hair loss; and

(1) Whether a reasonable alternative design existed that did not contain DMDM, MCI, or MI, including a design based on sodium benzoate, a non-sensitizing preservative Unilever eventually used to reformulate TRESemmé.

Below, Plaintiffs first establish that these liability issues will help prove substantially similar elements of failure to warn and design defect claims regardless of which state law applies to a Class member's claims. *See* III.A., *infra.* Plaintiffs then establish that Plaintiffs can determine the liability issues on a class-wide basis using common evidence and expert analysis addressing Unilever's common misconduct, rather than individualized Class member issues. III.B., *infra.*

**A.    Plaintiffs Seek to Certify Liability Issues That Will Help Prove Elements of the Failure to Warn and Design Defect Claims That Are Substantially Similar Across the Country**

As with all Rule 23 requirements, the party seeking certification has the "burden to demonstrate that any variations in relevant state laws do not predominate over the similarities."

*Langan v. Johnson & Johnson Consumer Companies, Inc*., 897 F.3d 88, 97 (2d Cir. 2018).[16] A federal court sitting in diversity jurisdiction applies the choice of law rules of a court of general jurisdiction in the forum state, here New York. *See In re AXA Equitable Life Ins. Co. COI Litig*., 595 F. Supp. 3d 196, 238 (S.D.N.Y. 2022).[17] For design defect and failure to warn claims, "New York courts apply an 'interest analysis to determine which of two competing jurisdictions has the greater interest in having its law applied[.]'" *Cacciola v. Selco Balers, Inc*., 127 F. Supp. 2d 175, 184 (E.D.N.Y. 2001). Under that analysis, courts generally apply the substantive law of the jurisdiction where the injury occurred. *Id.* "However . . . if there is no conflict between the law of the two jurisdictions, then New York law will apply." *2002 Lawrence R. Buchalter Alaska Tr. v. Philadelphia Fin. Life Assur. Co*., 96 F. Supp. 3d 182, 218 (S.D.N.Y. 2015).

Here, differences in product liability law among the forty-nine states where Class Members reside and were injured do not preclude Rule 23(c)(4) issue certification, as Plaintiffs only seek to certify liability issues central to elements of Plaintiffs' claims that are substantially similar across the country. "Variations in state laws do not necessarily prevent a class from satisfying the predominance requirement." *Langan*, 897 F.3d at 95. "[E]ven if 'choice of law rules required a court to apply the law of all fifty states, this would not render the trial per se unmanageable' and it is certainly possible to apply the laws of many states in a single class action.'" *In re Nigeria*

---

[16]  Whether a plaintiff can bring a class action under the state laws of multiple states is not a question of standing under Article III when the plaintiff's claims are similar to the claims of the class. *See Langan*, 897 F.3d at 96.

[17]  "New York courts apply New York's statute of limitations, subject to the traditional statutory exception provided in [CPLR] § 202.  Under CPLR § 202, when a nonresident plaintiff sues upon a cause of action that arose outside of New York, the court must apply the shorter limitations period, including all relevant tolling provisions, of either: (1) New York; or (2) the state where the cause of action accrued.  Hence, an action by a nonresident on a foreign cause of action is untimely if it is barred under the law of either New York or the state where the injury occurred." *Wilchfort v. Knight*, 307 F.Supp. 3d 64, 79 (E.D.N.Y. 2018). Here, as demonstrated by the Class Member Spreadsheet, Class members' injuries occurred almost exclusively in 2020 or 2021 (i.e., 1-2 years before Ms. Candelaria filed the Complaint) and, therefore, fall well within the statute of limitations for either New York or of their respective states, whichever may end sooner. *See* Ex. 37, Failure to Warn State Law Survey. Moreover, "[c]ourts have been nearly unanimous, . . . in holding that possible differences in the application of a statute of limitations to individual class members, including the named plaintiffs, does not preclude certification of a class action[.]" *In re Energy Sys. Equip. Leasing Sec. Litig*., 642 F. Supp. 718, 752–53 (E.D.N.Y. 1986).

*Charter Flights Cont. Litig.*, 233 F.R.D. 297, 305 (E.D.N.Y. 2006) (citation omitted). Indeed, "[a] claim . . . can implicate common issues and be litigated collectively, despite the existence of state law variations, so long as the elements of the claim . . . are substantially similar and any differences fall into a limited number of predictable patterns which can be readily handled by special interrogatories or special verdict forms." *Rodriguez v. It's Just Lunch, Int'l*, 300 F.R.D. 125, 135, 140-1 (S.D.N.Y. 2014) (certifying national class for fraud claim).

### i. A Failure to Warn Claim Has Substantially Similar Elements Across the Country

For the failure to warn claim, Plaintiffs must prove that: (1) Unilever had a duty to warn of the TRESemmé hair loss risk; (2) Unilever breached the duty to warn in a manner that rendered the product defective, *i.e.,* reasonably certain to be dangerous; (3) the defect was the proximate cause of injury; and (4) plaintiffs suffered loss or damage. *Humphrey v. Diamant Boart, Inc.*, 556 F. Supp. 2d 167, 178 (E.D.N.Y. 2008). Liability issues relating to the first two elements are certifiable under Rule 23(c)(4).

Whether Unilever had a duty to warn of the TRESemmé hair loss risk is substantially similar in every relevant state. As demonstrated by the Failure to Warn State Survey (Ex. 37), New York and every Class member state require a duty to warn for a viable failure to warn claim and recognize "that a manufacturer has a duty to warn (1) against latent dangers resulting from foreseeable uses of its product of which it knew or should have known[.]" *Humphrey v. Diamant Boart, Inc.*, 556 F. Supp. 2d 167, 179 (E.D.N.Y. 2008); *e.g.*, *In re Combat Arms Earplugs Products Liab. Litig.*, No. 3:19MD2885, 2021 WL 2186831, at *2 (N.D. Fla. May 27, 2021) ("Manufacturers generally owe a duty to warn foreseeable users of known dangers[.]") (citing *Robles v. Shoreside Petroleum, Inc.*, 29 P.3d 838, 842 (Alaska 2001)). Thus, Rule 23(c)(4)

21

certification of the duty to warn issues (Issues 1-3 above) involves substantially similar questions of law and will materially advance the litigation.

Once a duty to warn is established, determining whether a manufacturer has breached that duty is substantially similar in all jurisdictions. Under New York law, a "liability may be imposed based upon either the complete failure to warn of a particular hazard or the inclusion of warnings that are insufficient." *Palmatier v. Mr. Heater Corp.*, 163 A.D.3d 1192, 1192–93, 82 N.Y.S.3d 186, 188 (3d Dep't 2018) (citation omitted). This standard for determining breach is ubiquitous. *See, e.g.*, *Shanks v. Upjohn Co.*, 835 P.2d 1189, 1199–200 (Alaska 1992) ("Under a strict liability failure to warn theory, if the plaintiff proves . . . the product is marketed without adequate warnings of the risk, the product is defective"); *Hicks v. Com. Union Ins. Co.*, 652 So. 2d 211, 216 (Ala. 1994). ("The manufacturer of a product . . . is under a duty to exercise reasonable care to give reasonable and adequate warnings of any dangers known to him[.]"). Thus, Rule 23(c)(4) certification of the breach issue (Issue 4) will materially advance every Class member's claims up until the point of causation and damages (issues which Plaintiffs are not seeking to certify).

### ii. A Design Defect Claim Has Substantially Similar Elements Across the Country

For the design defect claim, Plaintiffs must prove that: (1) TRESemmé was defective and posed a substantial likelihood of harm; (2) it was feasible to design the TRESemmé products in a safer manner; and (3) the defective design was a substantial factor in causing plaintiff's injury. *See Sullivan v. Aventis, Inc.*, No. 14-CV-2939-NSR, 2015 WL 4879112, at *7 (S.D.N.Y. Aug. 13, 2015). Because the first two elements of this claim are substantially similar across the country, Rule 23(c)(4) certification of design defect issues (Issues 5 and 6 above) is appropriate.

First, whether a particular product was defectively designed falls into a limited number of predictable patterns in all forty-nine Class Member states, with most states employing either the

"risk-utility test" or the "consumer expectation test" (or both). *See* Ex. 38, Design Defect Survey. New York and fifteen other states[18] employ the "risk-utility test," which asks in substantial similar ways whether "a reasonable person would conclude that the utility of the product did not outweigh the risk inherent in marketing a product designed in that manner." *See Anderson v. Hedstrom Corp.*, 76 F. Supp. 2d 422, 455 (S.D.N.Y. 1999). Eleven states employ the "consumer expectations test," which asks whether the product did not perform as safely as an ordinary consumer would expect when used in the intended or reasonably foreseeable manner. *Force v. Ford Motor Co.*, 879 So. 2d 103, 106 (Fla. Dist. Ct. App. 2004). [19] Twelve states[20] employ both tests or a hybrid approach, with another five states[21] employing substantially similar unreasonable danger-type standards.[22] Given the substantial similarities across all jurisdictions for determining a design defect, the Court should certify the issue (Issue 5 above) under Rule 23(c)(4).

The law for determining whether there was a feasible alternative design is also uniform. Under New York law, "[t]he plaintiff must show that there was an economically and technically feasible alternative design available at the time the product was manufactured." *Wagner v. Kobelco Stewart Bolling, Inc.*, No. 07-CV-583S, 2014 WL 12725717, at *4 (W.D.N.Y. Dec. 29, 2014) (citing *Ruthoskv v. John Deere Co.*, 253 A.D.2d 620, 622 (3d Dep't 1997)). Like New York, forty-seven Class member states require or weigh the existence of a reasonable alternative design.[23]

---

[18] AL, AR, CO, GA, IA, KY, LA, ME, MN, MT, ND, NH, NJ, SC, and TX.

[19] IN, KS, MS, NE, NV, OK, OR, RI, UT, VT, and WI.

[20] AK, AZ, CA, CT, FL, IL, MD, OH, PA, SD, TN, and WA.

[21] ID, MO, NM, WV, and WY.

[22] DE, MA, MI, NC, VA do not formally recognize strict liability claims but follow variations of either the consumer expectation or risk-utility tests when a plaintiff asserts a design defect theory as a negligence or warranty claim.

[23] AL, AK, AZ, AR, CA, CO, CT, FL, GA, ID, IL, IN, IA, KS, KY, LA, ME, MD, MN, MS, MO, MT, NE, NV, NH, NJ, NM, NY, ND, OH, OK, OR, PA, RI, SC, SD, TN, TX, UT, VT, WA, WV. Four more states, MA, MI, NC, and VA recognize strict liability-like liability when brought as warranty or negligence claims and require or weigh the existence of a reasonable alternative design. *Aspen Am. Ins. Co. v. BrassCraft Mfg. Co.*, No. CV 23-10679-FDS, 2024 WL 308006, at *4 (D. Mass. Jan. 26, 2024) ("Massachusetts product liability law may tolerate a finding of design defect even in the absence of evidence supporting the existence of a feasible alternative design."); *Reeves v. Cincinnati, Inc.*, 439 N.W.2d 326, 329 (1989) ("It secondly requires a showing of alternative safety devices[.]"); N.C. Gen. Stat. Ann. § 99B-6 ("[T]he manufacturer unreasonably failed to adopt a safer, practical, feasible, and otherwise reasonable

Thus, determining whether there was a reasonable alternative design for TRESemmé shampoo (Issue 6 above) will materially advance Class members' claims up until the point of causation.

### B. Plaintiffs Will Prove Central Liability Issues Using Common Evidence and Expert Analysis Focused Solely on Unilever's Misconduct

Rule 23(c)(4) issue certification will enable Plaintiffs to prove liability elements of the failure to warn and design defect liability elements on a class-wide basis through the use of common evidence directed solely at Unilever's misconduct. For the failure to warn claim, Plaintiffs will demonstrate on a class-wide basis that Unilever knew of the TRESemmé hair loss risk based on: (1) access to scientific and medical literature and data demonstrating that DMDM, MCI, and MI can cause skin reactions, dermatitis, and hair loss; (2) hundreds of consumer reports to Unilever that they had lost their hair after using DMDM-containing hair care product; and (3) regulatory actions and competitor efforts to remove DMDM, MCI, and MI, all common facts establishing Unilever's duty to warn well before Plaintiffs and the Class were injured. Plaintiffs will also prove on a class-wide basis that Unilever breached the duty to warn because it indisputably failed to disclose the hair loss risk in any fashion. The expert analysis of Dr. Thiffault, Dr. Serota, and Dr. Motley will also help determine the failure to warn issues on a class-wide basis.

For the design defect claim, Plaintiffs will establish on a class-wide basis that TRESemmé containing DMDM, MCI, and MI was defective and posed a substantial risk to Plaintiffs and the Class. They will use Unilever's own documents and testimony, admissions by Unilever's expert Dr. DeKoven, and expert testimony from Dr. Serota and Dr. Thiffault demonstrating that TRESemmé created an unreasonable risk of skin reactions, dermatitis, and hair loss based on an extensive body of medical and scientific literature and data demonstrating that risk. Plaintiffs will

---

alternative design or formulation[.]"); *Evans v. Nacco Materials Handling Grp., Inc*., 295 Va. 235, 249, 810 S.E.2d 462, 471 (2018) ("[W]e hold that a design is not objectively unreasonable unless the plaintiff can show that an alternative design is safer overall[.]")

further support their showing of substantial risk of harm through testimony and documents demonstrating the regulatory, retail, and manufacturing shift away from DMDM, MCI, and MI due to their sensitization and carcinogenic dangers. Plaintiffs will also establish on a class-wide basis the feasibility and availability of a reasonable and commercially practicable alternative design—one containing sodium benzoate as the primary preservative—through: (1) the expert testimony of Dr. Thiffault: (2) testimony and documents showing that Unilever's competitors manufactured shampoos containing sodium benzoate long before Plaintiffs and the Class were injured; and (3) Unilever's own reformulation of TRESemmé.

## IV.  A Class Action Is a Superior Method for Adjudicating Central Liability Issues

To determine whether a class action is a superior method of adjudicating like claims, courts consider:  (1) "the class members' interest in individually controlling the prosecution"; (2) "the extent and nature of any litigation concerning the controversy already begun"; (3) "the desirability or undesirability of concentrating the litigation of the claims in the particular forum"; and (4) "the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3)(A)-(D). Here, each of these factors weighs in favor of certification. There are more than 700 members in the Class, each of whom lost her hair after using TRESemmé containing DMDM and/or MCI/MI. Class members will be well served by the economies of scale and efficiencies gained by determining central liability issues in this case. Likewise, Class proceedings will conserve judicial economy by simultaneously adjudicating key aspects of the claims of hundreds of Class members.

### <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully requests that the Court: (i) certify the issues identified above under Rule 23(c)(4); (ii) appoint Plaintiffs as Class Representatives; and (iii) appoint S&F as Class Counsel.

25

Dated: May 31, 2024

**SQUITIERI & FEARON, LLP**

By: /s/  Stephen J. Fearon, Jr.
Stephen J. Fearon, Jr.
Paul Sweeny
305 Broadway, 7th Floor
New York, New York 10007
Tel:  (212) 421-6492
Fax:  (212) 421-6553
stephen@sfclasslaw.com
paul@sfclasslaw.com